THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SIGRUN E. HOLLIDAY,                    :
                                       :
          Plaintiff                    :
                                       :        3:14-CV-00708
     vs.                               :
                                       :        (Judge MARIANI)
CAROLYN W. COLVIN, ACTING              :
COMMISSIONER OF SOCIAL                 :
SECURITY,                              :
                                       :
          Defendant                    :

## MEMORANDUM

## Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Sigrun E. Holliday's claim for social security disability insurance benefits.

Holliday protectively filed[1] her application for disability insurance benefits on December 15, 2010. Tr. 10, 164 and 288.[2] The application was initially denied by the Bureau of Disability Determination[3] on April 7, 2011. Tr. 10 and 165-169. On June 7, 2011, Holliday requested a hearing before an administrative law judge. Tr. 10 and 170-171. Subsequently hearings were held before an administrative law judge on April 10, July 2 and October 18, 2012. Tr. 29-150. Holliday was represented by counsel at the

---

1.    Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.    References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on June 23, 2014.

3.    The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 166.

hearing held on October 12, 2012. Tr. 90-150.  On December 26, 2012, the

administrative law judge issued a decision denying Holliday's application. Tr. 10-22. As

will be explained in more detail *infra* the administrative law judge found that Holliday

failed to prove that she met the requirements of a listed impairment or suffered from

work-preclusive functional limitations.  Id.  Instead Holliday had the ability to perform a

limited range of sedentary  work.[4]  Tr. 21-22.  On February 19, 2013, Holliday filed a

---

4 .    The terms sedentary, light, medium, heavy and very heavy work are defined in the
regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10
> pounds at a time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools. Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties. Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these
> activities. If someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting factors such
> as  loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work.*  Medium work involves lifting no more than 50 pounds at
> a time with frequent lifting or carrying of objects weighing up to 25 pounds.
> If someone can do medium work, we determine that he or she can do
> sedentary and light work.

> (d) *Heavy work.*  Heavy work involves lifting no more than 100 pounds at a
> time with frequent lifting or carrying of objects weighing up to 50 pounds.
> If someone can do heavy work, we determine that he or she can also do
> medium, light, and sedentary work.

> (e) *Very heavy work.*  Very heavy work involves lifting objects weighing
> more than 100 pounds at a time with frequent lifting or carrying of objects
> weighing 50 pounds or more.  If someone can do very heavy work, we
> determine that he or she can also do heavy, medium, light and sedentary
> work.

(continued...)

request for review with the Appeals Council and after 12 months had elapsed the Appeals Council on February 21, 2014, concluded that there was no basis upon which to grant Holliday's request for review. Tr. 1-6 and 343-347.

Holliday then filed a complaint in this court on April 10, 2014. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on November 12, 2014, when Holliday filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Holliday met the insured status requirements of the Social Security Act through June 30, 2013. Tr. 10 and 12.

Holliday was born in the United States on May 20, 1977, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1516©; Tr. 58, 164, 271, 288 and 875.

Holliday graduated from high school in 1995, and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 291, 305 and 494. During her primary and secondary schooling, Holliday attended

---

4.    (...continued)

20 C.F.R. § 404.1567.

5.    The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing held on October 12, 2012, Holliday was 35 years old.

regular education classes.[6]  Tr. 293.  Holliday also during high school completed vocational courses in graphic arts and screen printing.[7]  Tr. 494.  After graduating from high school Holliday attended college for two years and in 1997 obtained a degree from Thaddeus Stevens College of Technology, Lancaster, Pennsylvania, in printing technology. Id.

Holliday's work history covers 17 years and at least 4 different employers. Tr. 281-284, 315 and 339.  The records of the Social Security Administration reveal that Holliday had earnings in the years 1993 through 1996, 1998 through 2008, and 2010 through 2011. Tr. 281 and 287.  Holliday's annual earnings range from a low of $212.00 in 1996 to a high of $38,937.71 in 2002. Id.  Holliday's total earnings during those 17 years were $258,647.19. Id.  Holliday's earnings of $3464.00 during 2010 and $4479.00 during 2011 were from self-employment as an artist and the sale of miscellaneous home items. Tr. 104-105, 284 and 287.  Holliday testified that in 2010 and 2011 she painted acrylic and water color paintings. Id.

Holliday in documents filed with the Social Security Administration stated that she worked as a film stripper for a printing company, Wickersham Printing Company, Inc., King of Prussia, Pennsylvania, from June, 1997, to April, 1998; as an electronic

6.    The record does reveal that Holliday was in "emotional support classes throughout high school." Tr. 493.

7.    "Screen printing, also known as serigraphy, is a method of creating an image on paper, fabric or some other object by pressing ink through a screen with areas blocked off by a stencil. The technique is used both for making fine art prints and for commercial applications, such as printing a company's logo on coffee mugs or t-shirts." Screen Printing (serigraphy), Definition, WhatIs.com, http://whatis.techtarget.com/definition /screen-printing-serigraphy (Last accessed June 1, 2015).

4

systems operator[8] for a printing company, R.R. Donnelley & Sons Company, from January 1999 to June 2006;[9] and as a server at two different restaurants, a Waffle House and Friendly's, from January, 2007, to March, 2008.[10] Tr. 282-284, 315 and 339.

Holliday has past relevant employment[11] as (1) a film stripper for a printing company which was described by a vocational expert as skilled, light work; (2) a scanner operator which was described as skilled, medium work; and (3) a waitress described as semi-skilled, light work. Tr. 133 and 135-136.

Holliday initially contended that she became disabled on March 1, 2008, because of both physical and mental impairments. Tr. 271 and 292. At the administrative hearing held on October 18, 2012, Holliday amended her alleged disability onset date to October 23, 2009.[12] Tr. 95-96. The physical impairments alleged by Holliday were

---

8. This position was referred to as a scanner operator by the vocational expert who testified at the administrative hearing on October 18, 2012. Tr. 136.

9. Holliday earned $21,667.18 in 1999; $27,074.62 in 2000; $32,937.71 in 2001; $38,575.44 in 2002; $36,108.84 in 2003; $29,208.87 in 2004; $24,497.43 in 2005; and $15,557.25 in 2006. Tr. 281.

10. The record reveals that Holliday worked for a Waffle House located in Lancaster during 2007 and earned $10,945.48 and at a Friendly's Restaurant also located in Lancaster during 2008 and earned $2804.35. Tr. 283-284 and 339.

11. Past relevant employment in the present case means work performed by Holliday during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

12. One of the claims raised by Holliday in the present appeal is that the administrative law judge did not consider the proper alleged disability onset date. The administrative law judge at the hearings on both April 10 and July 2, 2012, noted that Holliday had filed a previous application for benefits and that Holliday could not assert an alleged onset date before December 8, 2009, because that prior case was dismissed on December 7, 2009, and Holliday did not appeal that dismissal. Tr. 38 and 50-51. The administrative law judge at the hearing on October 18, 2012, accepted the request to amend the onset date to October 23, 2009, but then in her decision set the onset date as March 1, 2008, and considered evidence going back to that date.
(continued...)

5

degenerative disc disease,[13] chronic sciatica causing leg pain, carpal tunnel syndrome

and obesity.[14] Tr. 292. The mental impairments were depression, bipolar disorder,

_____

12. (...continued)

Consequently, the administrative law judge in essence reopened the prior case which had been dismissed to the extent that evidence was considered from March 1, 2008, until the date of his decision on December 26, 2012. This decision by the administrative law judge to reopen and consider evidence from March 1, 2008, forward in no way prejudiced Holliday and Holliday's claim that the administrative law judge's decision is defective because she used the March 1st date is devoid of any merit whatsoever.

13. The spine consists of several elements including vertebral bodies and intervertebral discs. The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance.

   Degenerative disc disease is the wear and tear and breakdown of the intervertebral discs as a person grows older. It is a process that can result from the dehydration of the discs as well as an injury to the spine. The breakdown of the intervertebral discs can result in discs bulging, protruding or herniating as well as the inner gelatin-like core of the disc extruding outside the outer layer. These conditions sometimes obstruct the openings (foramen) along the spine through which nerve roots exit. This condition is known as neural foraminal narrowing or stenosis. They can also result in a narrowing of the spinal canal or spinal stenosis. Such bulges, protrusions and herniations if they contact nerve tissue can cause pain.

   Degenerative joint disease (or osteoarthritis) is a breakdown of the cartilage between joints. In the spine there are facet joints which are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. These joints are covered with cartilage and the wear and tear of these joint is known as facet arthropathy (arthritis). This wear and tear of the facet joints result in loss of cartilage and can cause pain.

14. The administrative record reveals that Holliday's weight fluctuated. At one point in 2011 she reported that she was 5'11" tall and weighed 350 pounds. Tr. 292. A person of such height and weight has a body mass index of 48.8 and is considered obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english _bmi_calculator/bmi_calculator.html (Last accessed June 1, 2015). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www. Mayoclinic.com/health/obesity/DS00314 (Last accessed June 1, 2015). Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when the person has a
(continued...)

6

anxiety, posttraumatic stress disorder and borderline personality disorder. Id. Holliday
has not engaged in any substantial gainful activity since March 1, 2008.[15] Tr. 12. Holliday
was apparently fired in March, 2008, from her last position as a waitress at Friendly's
Restaurant because of frequent absences. Tr. 521.

The record reveals that Holliday was the victim of sexual abuse during her
formative years and that she has a history of drug abuse (crack cocaine, heroin and
marijuana). Tr. 358, 495-497 and 913.

The record reveals that Holliday engaged in a wide range of activities of
daily living. Holliday cooked, cleaned, washed laundry, helped her parents with yard work
and odd jobs on their farm, helped care for her 12 year old son and her boyfriend's four
year old son, and enjoyed taking walks in the woods. Tr. 82, 84, 303, 497-498, 598, 791,
824 and 876. Also, as noted above, she sold artwork that she painted as well as
miscellaneous household items at local markets and online. Tr. 61 and 104-105.
Holliday took college courses, read, and wrote poetry and journal entries. Tr. 72, 79 and
495. She also attended church and narcotics anonymous meetings and had a close
friend and a boyfriend. Tr. 305-306, 495 and 876.

For the reasons set forth below we will affirm the decision of the
Commissioner denying Holliday's application for disability insurance benefits.

---

14.    (...continued)
BMI of 40 or more. With morbid obesity, the person is especially likely to have serious
health problems. Id.

15.    Pursuant to Federal Regulations a person's earnings have to rise to a certain
level to be considered substantial gainful activity. Holliday's earnings in 2010 and 2011
did not rise to the substantial gainful activity level.

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to

9

> any individual), "work which exists in the national economy" means work
> which exists in significant numbers either in the region where such
> individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability

insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos,

474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity,[16] (2) has an impairment

that is severe or a combination of impairments that is severe,[17] (3) has an impairment or

combination of impairments that meets or equals the requirements of a listed

impairment,[18] (4) has the residual functional capacity to return to his or her past work and

(5) if not, whether he or she can perform other work in the national economy. Id. As part

---

16.    If the claimant is engaging in substantial gainful activity, the claimant is not
disabled and the sequential evaluation proceeds no further. Substantial gainful activity
is work that "involves doing significant and productive physical or mental duties" and "is
done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

17.    The determination of whether a claimant has any severe impairments, at step
two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If
a claimant has no impairment or combination of impairments which significantly limits
the claimant's physical or mental abilities to perform basic work activities, the claimant
is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any
severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g).
Furthermore, all medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§
404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or
mental abilities when its effect on the claimant to perform basic work activities is more
than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift,
carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An
individual's basic mental or non-exertional abilities include the ability to understand,
carry out and remember simple instructions, and respond appropriately to supervision,
coworkers and work pressures. 20 C.F.R. § 1545(c).

18.    If the claimant has an impairment or combination of impairments that meets or
equals a listed impairment, the claimant is disabled. If the claimant does not have an
impairment or combination of impairments that meets or equals a listed impairment, the
sequential evaluation process proceeds to the next step.

of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[19]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Holliday's medical records. Initially, we will note that the relevant time period is from March 1, 2008, through the date the administrative law judge issued a decision denying Holliday's application. The administrative record in this case is 1446 pages in length. Holliday has primarily contended that she is disabled because of back pain, lower extremity pain and mental health impairments. The court in its review of the records will primarily focus on those conditions.

---

19. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

For background purposes we will commence with some medical records which predate the alleged disability onset date of March 1, 2008. In September, 2005, Holliday underwent a bilateral L5-S1 laminectomy and right L5-S1 diskectomy without complications and post-operatively she did well.[20] Tr. 462-463. On February 8, 2006, when Holliday established a primary care relationship with Brian P. Sullivan, M.D., of Family Practice Associates of Lancaster, her only concern was her weight, a history of high blood pressure and menometrorrhagia.[21] Tr. 490. Holliday reported that she smoked 1 pack of cigarettes per day. Id. After performing a physical examination, Dr. Sullivan's diagnostic assessment was that Holliday suffered from high blood pressure, morbid obesity and a history of menometrorrhagia. Id. The reported objective physical examination findings were normal other than Holliday's blood pressure was 180/98. Id. Dr. Sullivan adjusted Holliday's blood pressure medications, ordered blood tests and scheduled a 1 month follow-up appointment. Id. At the follow-up appointment on March 8, 2006, Holliday reported that she "had no complaints [and] generally [had been] doing well" but she continued to smoke one pack of cigarettes per day. Tr. 490. Most of the appointment time was spent "counseling [Holliday] regarding smoking cessation." Id. Dr.

---

20. A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. The lamina is a posterior arch of the vertebral bone on each side of the spinous process. The two lamina and the spinous process constitute the posterior bony wall of the spinal canal. A laminectomy is a procedure which involves the removal of the lamina that overlays the spinal canal. It enlarges the spinal canal and is performed to relieve nerve pressure caused by spinal stenosis. A diskectomy or discectomy is a procedure which involves removal of the herniated portion of a disk to relieve pressure on a nerve.

21. Menometrorrhagia is defined as "excessive and prolonged uterine bleeding occurring at irregular, frequent interval." Dorland's Illustrated Medical Dictionary, 1135 (32nd Ed. 2012).

12

Sullivan noted that Holliday's blood pressure had improved and he was satisfied with the result. Id.

On May 21, 2006, Holliday visited the emergency department at the Lancaster General Hospital complaining of a sore throat. Tr. 454-456. During that visit Holliday reported no neck pain, no joint pain, no back pain, no headaches, no paresthesias (pins and needles), no focal weakness and no sensory changes. Id. The reported physical and mental status examination findings were essentially normal. Id. The diagnostic assessment was that Holliday suffered from uvulitis[22] which resulted from untreated sleep apnea. Tr. 455. Holliday was prescribed the antibiotic amoxicillin and advised to follow-up with her primary care physician, Dr. Sullivan. Id. The follow-up appointment occurred on May 22, 2006, at which time Dr. Sullivan reported no adverse objective physical examination findings other than Holliday's throat appeared "mildly erythematous"[23] but her uvula did not appear "overly enlarged[.]" Tr. 489. Dr. Sullivan referred Holliday to a pulmonologist for a sleep evaluation. Id.

On May 31, 2006, Holliday had an appointment with John T. Joseph, M.D., of Conestoga Pulmonary & Sleep Medicine. Tr. 486-488. After conducting a clinical interview, a physical examination and reviewing a prior sleep study, Dr. Joseph's impression was as follows: "Previously documented obstructive sleep apnea. This patient, in the interval, has gained 45 lbs. since her study two years ago." Tr. 488. Dr.

---

22. The uvula palatina is defined as "the small, fleshy mass hanging from soft palate above the root of the tongue" at the back of the mouth. Dorland's Illustrated Medical Dictionary, 2014 (32nd Ed. 2012). Uvulitis is an "inflamation of the uvula." Id.

23. Erythema is defined as "redness of the skin produced by congestion of the capillaries." Dorland's Illustrated Medical Dictionary, 643 (32nd Ed. 2012).

Joseph prescribed a CPAP machine. Id. Notably, during the clinical interview Holliday denied any neurological problems, weakness, muscle aches or joint pain. Tr. 487. The physical examination revealed that she had normal muscle strength. Id.

At an appointment with Dr. Sullivan on August 31, 2006, Holliday complained of lower extremity edema which Dr. Sullivan concluded possibly was related to the blood pressure medication which Holliday was taking. Tr. 485. Dr. Sullivan prescribed a different medication. Id. On September 22, 2006, Holliday complained of swelling in her throat which Dr. Sullivan attributed to her blood pressure medication and again he discontinued the medication and prescribed a different medication. Tr. 484. On April 9, 2007, Holliday appears to have had an appointment with either an associate of Dr. Sullivan or a nurse or physician's assistant employed by Dr. Sullivan regarding bilateral conjunctivitis (pink eye). Tr. 483. Holliday was treated with eye drops and an antibiotic. Id. In July and August, 2007, Holliday was treated by Kathleen Sheridan, M.D., a gynecologist, for persistent menorrhagia and endometrial hyperplasia.[24] Tr. 420-423, 540-543 and 549-554.

From August 22 to 24, 2007, Holliday underwent a psychiatric hospitalization at the Lancaster Regional Medical Center for a suicide attempt. Tr. 353-359 and 365-384. It was reported that Holliday consumed twenty-one 100mg tablets of the antidepressant Wellbutrin around 7:00 p.m. on August 21, 2007, and she arrived at

---

24. Menorrhagia is "the medical term for menstrual periods with abnormally heavy or prolonged bleeding." Menorrhagia (heavy menstrual bleeding), Mayo Clinic Staff, http://www.mayoclinic.org/diseases-conditions/menorrhagia/basics/definition/CON-2002 1959 (Last accessed June 5, 2015). "Endometrial hyperplasia is an excessive or abnormal thickening of the lining of the uterus." What is endometrial hyperplasia?, healthgrades http://www.healthgrades.com/right-care/womens-health/ endometrial-hyperplasia (Last accessed June 5, 2015).

14

the emergency department of Lancaster Regional Medical Center at about 10:59 p.m. by ambulance. Tr. 375 and 380. Holliday "was found to be quite stable, as far as her vital signs [were] concerned, but the poison center [] recommended some sedation and ongoing observation for any seizure potential and other serotonin syndromes."[25] Tr. 375. At the time of admission, the diagnostic assessment was that Holliday suffered from depressive disorder, not otherwise specified and she was given a Global Assessment of Functioning (GAF) score of 50.[26] Tr. 359. During the psychiatric hospitalization, Holliday

---

25. Serotonin is chemical produced by the body that enables brain cells and other nerve cells to communicate with one another. Too much of the substance can cause excessive nerve cell activity resulting in a collection of symptoms known as serotonin syndrome. The symptoms include confusion, headache, nausea, diarrhea, tremor and loss of coordination. What is Serotonin Syndrome? WebMD, http://www.webmd. com/depression/guide/serotonin-syndrome-causes-symptoms-treatments (Last accessed June 5, 2015).

26. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. Diagnostic and Statistical Manual of Mental Disorders 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some
(continued...)

reported that she smoked one to two packs of cigarettes per day; she lived with her son
who was nine years old and her sister; and she worked at the Waffle House in Lancaster.
Tr. 375-376, 380 and 384. Holliday reported no pain and the results of the physical
examination were essentially normal. Tr. 376 and 380. Holiday denied any history of
alcohol or drug abuse. Tr. 367. Holliday was discharged from the hospital on August 24th
with the same diagnostic assessment and GAF score. Tr. 353. The course of Holliday's
psychiatric hospitalization was described in the discharge summary as follows:

> The patient's stay in the hospital was brief. She quickly showed improved
> affect. She was able to contract for safety, recognize the fact that the
> relationship [with a boyfriend] may not be working well in her favor and was
> no longer suicidal, was able to participate in unit activities and individual
> sessions. Subsequently the patient was started on Prozac 20 mg daily, the
> use of medication was explained to patient. She showed interest in
> continuing her medicine and following up with Dr. Sullivan in the Family
> Practice Associates of Lancaster and also being referred to MH/MR for
> follow-up.

Tr. 354. Holliday's discharge medications were Prozac, the high blood pressure
medication Atenolol/Chlorthalidone and Provera, to treat her menorrhagia. Id.

On September 18, 2007, Holliday had a follow-up appointment with Dr.
Sullivan at which Holliday reported that she was "seeing a counselor through church and
[felt] a lot of issues going on, while not resolved, [were] starting to improve." Tr. 482. It
was noted that Holliday was taking Tenoretic for blood pressure control; she denied
shortness of breath; she was currently smoking; and she was working full-time at the
Waffle House. Id. Dr. Sullivan reported that Holliday's blood pressure was stable; she
seemed to be doing much better psychologically; and her sleep apnea was stable. Id. He

---

26.    (...continued)
meaningful interpersonal relationships. Id.

16

further noted that Holliday was still being treated by a gynecologist for a history of uterine bleeding and polycystic ovarian syndrome. Id.

From the date Holliday had a her back surgery in 2005 through November, 2007, Holliday's medical records do not reveal that she complained of low back pain or lower extremity pain. Id. The first time that Holliday complained of lower extremity pain was at an appointment with Dr. Sullivan on December 17, 2007. Tr. 481. Holliday stated that since her 2005 surgery "her back [had] been relatively stable but over the past week or so she [] had some increasing pain down her [right] leg and yesterday it became more severe." Id. Holliday stated that the pain was similar to "when she had her previous back problems" and the "pain goes the whole way to her foot." Id. Holliday denied any numbness, tingling or weakness. Id. Holliday also reported some depression. Id. A physical examination revealed tenderness to palpation over the right lumbar area and the sciatic area; a positive straight leg raise test on the right;[27] and no detectable weakness on the right. Id. Dr. Sullivan's diagnostic assessment was that Holliday suffered from radicular pain and depression and he prescribed medications. Id.

At an appointment with Dr. Sullivan on January 11, 2008, Holliday reported "worsening problems with anxiety" but that her sister gave her a Xanax pill and "[s]he was able to go to two job interviews[.]" Tr. 480. No objective physical examination findings were recorded by Dr. Sullivan and the entire appointment "was spent in counseling and

---

27. The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise,SpineUniverse,http://www.spineuniverse.com/experts/testing-herniated-discs-stra ight-leg-raise (Last accessed June 5, 2015).

17

discussion." Id. Dr. Sullivan prescribed the antidepressant Lexapro and the anxiety medication Xanax (alprazolam). Id. At the end of January, Holliday fell on an icy patch on her sidewalk and landed on her right side. Tr. 479. Holliday used her right arm to break her fall and in the process injured her right wrist. Id. Other than some palpable pain and swelling in the right wrist, the results of a physical examination were normal. Id. Dr. Sullivan suspected that Holliday primarily suffered a soft tissue injury and advised her to apply ice to her wrist and take ibuprofen or Aleve. Id. At a follow-up appointment with Dr. Sullivan on February 4, 2008, Holliday continued to complain of wrist pain but also reported right shoulder pain. Tr. 479. Again other than noting palpable pain in the wrist and shoulder area, the results of a physical examination were normal. Id. Dr. Sullivan ordered x-rays of Holliday's right wrist and shoulder and referred her to physical therapy. Id. He also prescribed the narcotic-like pain medication tramadol and Percocet (a combination of acetaminophen and oxycodone) . Id. An x-ray of the wrist and shoulder performed on February 4th revealed no fractures or dislocations Tr. 451, 477-478 and 688.

On February 26, 2008, Holliday had an appointment with Dr. Sullivan regarding nasal congestion and frequent bloody noses. Tr. 476. After performing a physical examination, the results of which were essentially normal other than edema in the nasal passages and what appeared to be a nasal polyp, Dr. Sullivan decided to "treat her empirically for sinusitis with Amoxicillin," an antibiotic. Id.

After Holiday's alleged disability onset date of March 1, 2008, Holliday phoned Dr. Sullivan's office on March 15th complaining of back pain. Tr. 474. In response, Dr. Sullivan issued a prescription for the nonsteroidal anti-inflammatory drug

18

Voltaren (diclofenac), the muscle relaxant Flexeril and the narcotic pain medication
Vicodin. Id. On March 20, 2008, Dr. Sullivan provided Holliday with a prescription for the
narcotic pain medication Percocet and on March 26th the anxiety medication Xanax. Id.
On the note relating to the Percocet prescription Dr. Sullivan stated that he was going to
have an "impossible time" finding a back specialist for Holliday in light of her lack of
insurance. Id.

On March 28, 2008, Holliday visited the emergency department of the
Lancaster General Hospital complaining of left lower back pain and tenderness and
decreased range of motion of the back. Tr. 639-641. Holliday described the pain as
going down the left buttock and into the posterior hamstring (muscles of the back of the
upper leg). Tr. 639. Holliday had no weakness or tingling in the her left lower extremity.
Id. The results of a physical examination were essentially normal, including she had a
negative straight leg raising test, normal lower extremity range of motion, no motor or
sensory deficits, normal deep tendon reflexes and no lower extremity edema. Tr. 640.
The only adverse objective findings were that Holliday had some paraspinal tenderness,
in the lower back, palpable pain in the hamstring but not the knee joint, and increased
pain with active and passive proximal leg straightening. Id. Holliday was discharged the
same day with a diagnosis of sciatica[28] and advised to apply heat to the affected area 3-4
times per day, take Tylenol or Advil for pain, and follow-up with Dr. Sullivan. Id. On

---

28. Sciatica is defined as "a syndrome characterized by pain radiating from the back
into the buttocks and along the posterior or lateral aspect of the lower limb; it is most
often caused by protrusion of a low lumbar intervertebral disk. The term is also used to
refer to pain anywhere along the sciatic nerve." Dorland's Illustrated Medical Dictionary,
1678 (32nd Ed. 2012).

19

discharge Holliday was also given ten 2 mg tablets of the narcotic pain medication Dilaudid[29] to be taken every 4-6 hours as needed. Id.

On April 2, 2008, Holliday had a follow-up appointment with Dr. Sullivan at which she reported that the Dilaudid was helping but "she continue[d] to have really severe pain. Tr. 473. In contrast to what she told the emergency department personnel at Lancaster General Hospital regarding pain in her left lower back and left lower extremity, she now reported that the pain was "in her [right] lower back radiating into her leg" with "some numbness down into her leg as well as pain." Id. Holliday also reported irritability, depression and mood swings but denied any thoughts of suicide and she contracted with Dr. Sullivan "for safety." Id. No physical examination was performed by Dr. Sullivan and the entire appointment was "spent in counseling & discussion." Id. Dr. Sullivan prescribed the drugs Lexapro, Zyprexa[30] and Dilaudid. Id.

At an appointment with Dr. Sullivan on April 14, 2008, Holliday complained of very severe low back pain which sometimes radiated down into her legs. Tr. 472. Holliday reported that the pain gets worse the longer she walks. Id. Holliday also reported that she was having less problems with racing thoughts since starting Zyprexa and that she was sleeping better. Id. She stated that her overall mood had improved and that she was not having suicidal thoughts. Id. The objective physical examination findings reported by Dr. Sullivan were essentially normal other than Holliday had some

---

29.    Dilaudid or hydromorphone, a derivative of morphine, is a very potent opioid medication.

30.    Zyprexa (olanzapine) is an antipsychotic medication which is used to treat schizophrenia and bipolar disorder. Zyprexa, Drugs.com, http://www.drugs.com/zyprexa.html (Last accessed June 5, 2015).

tenderness over the lower back and buttocks and a positive straight leg raising test but Dr. Sullivan did not report on which side. Id. Holliday's strength was normal. Id. It was noted that Holliday now had insurance and Dr. Sullivan ordered an MRI of Holliday's lumbar spine and referred her to physical therapy and back specialist, Dr. Kager, who performed her prior surgery. Id. Dr. Sullivan prescribed the medications Dilaudid and Xanax. Id.

An MRI of Holliday's lumbar spine performed on April 25, 2008, revealed "[p]ostsurgical changes at L5-S1 without disc herniation or distortion to the thecal sac"[31] and "degenerative facet disease at L4-5 which has mildly progressed since the old exam." Tr. 744. A notation on the report of the MRI dated May 6, 2008, by Dr. Sullivan stated that "overall the MRI doesn't really show much to explain the degree of pain she is having. Hopefully, Dr. Kager can help sort it all out." Tr. 471.

On April 30, 2008, Dr. Kager examined Holliday and then prepared a report of his findings which was transcribed on May 7, 2008, and forwarded to Dr. Sullivan. Tr. 728. In the report of the examination Dr. Kager stated that Holliday smokes one pack of cigarettes per day; she drinks occasionally; and she was not working apparently because of her psychiatric issues. Tr. 729. The results of a physical examination performed by Dr. Kager were essentially normal other than Holiday was obese and she had some tenderness to palpation in the right sacroiliac joint region. Tr. 729-730. Dr. Kager noted

---

31. The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which merely impinge the thecal sac without contacting nerve tissue do not cause pain symptoms. See Thecal Sac Impingement, Cure-Back-Pain.Org,http://www.cure-back-pain.org/thecal-sac-impingement.html (Last accessed February 6, 2015).

21

that Holliday's gait was normal; her muscle strength and tone were normal; her sensation

was normal; her reflexes and coordination were normal; she had a negative straight leg

raise test; and a negative Babinski[32] and Hoffman's sign.[33] Tr. 730. Dr. Kager stated that

he could not correlate Holliday's complaints of pain directly to her lumbar spine. Id. His

diagnostic impression was merely "[r]ight buttock, lower extremity pain." Id. Dr. Kager

recommended that Holliday commence physical therapy and because she was

complaining about right hip pain ordered an x-ray of her pelvis and hip. Id. The x-ray was

performed on May 1, 2008, and revealed that the bones were intact and normally

mineralized; the joint spaces were well maintained; and there was no evidence of soft

tissue calcification to indicate bursitis or tendinitis. Tr. 743.

On May 14, 2008, Holliday had an appointment with Dr. Sullivan at which

Holliday continued to complain of pain in her lower back and down into her right buttocks.

Tr. 470. Holliday did report that her psychiatric symptoms were improved, including her

mood was much better and she was sleeping throughout the night without difficulty. Id.

The results of a physical examination were essentially normal other than she had some

tenderness in the lower back, more so on the right than the left and into the buttocks. Id.

---

32. An abnormal response "called the Babinski's sign, is characterized by an upgoing big toe and fanning outward of the other toes." Plantar Response, Neuroexam.com, http://www.neuroexam.com/neuroexam/content.php?p=32 (Last accessed June 19, 2014). The presence of the Babinski's sign suggests brain or spinal cord injury.

33. The Hoffman's sign is a neurological sign in the hand which is suggestive of spinal cord compression. The test involves tapping the nail on the third and fourth finger. "The test is positive for spinal cord compression when the tip of the index finger, ring finger, and/or thumb suddenly flex in response." Hoffman Sign: Red Flag for Cervical Myelopathy, Orthopod,http://www.eorthopod.com/content/hoffmann-sign-red-flag-for-cervical-myelopathy (Last accessed June 5, 2015).

22

Straight leg raising tests were negative. Id. Holliday did have some pain with internal and external rotation of the hip. Id. However, overall her range of motion was pretty good and she had normal deep tendon reflexes. Id. Dr. Sullivan continued Holliday's current medications. Id.

On June 27, 2008, Holliday had an appointment with Dr. Sullivan at which she reported that she had been on the antidepressant Celexa "now for a month and half or so" to treat her depression and it "seem[ed] to be working well." Tr. 492. Holliday told Dr. Sullivan that "a few months ago when things were bad she got in with the wrong crowd of people and was abusing cocaine but she has been clean for 1 month." Id. Holliday reported that she ran out of the Zyprexa and was having some problems with sleeping. Id. No physical examination was performed during this appointment and the entire time was spent in counseling and discussion. Id. Dr. Sullivan gave Holliday a prescription for Zyprexa. Id.

On July 17, 2008, Holliday was evaluated by Lynette G. Ruch, Ph.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 493-499. After performing a clinical interview and a mental status examination, Dr. Ruch concluded that Holliday suffered from posttraumatic stress disorder, chronic, mild to moderate; dysthymic disorder, early onset, mild to moderate;[34] and personality disorder, not otherwise specified, moderate to severe. Tr. 498. Dr. Ruch gave Holliday a current GAF score of 45. Id. Dr. Ruch also noted that she could not rule out the possibility that Holliday suffered from polysubstance abuse. Id. Specifically, Dr. Ruch stated as follows:

---

34. Dysthymia "is a mild but long-term (chronic) form of depression." Dysthymia, Definition, Mayo Clinic Staff, http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/CON-20033879 (Last accessed June 5, 2015).

23

" Ms. Holliday reports she has been in recovery for 60 days from crack cocaine. She reports she used for 2 ½ months and this was a relapse. Apparently in the past she has also used marijuana. She denied any history of alcohol. She reports she is fearful of being an alcoholic. It is not clear how accurate this history is." Tr. 495-496. In a separate document entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" Dr. Ruch stated that Holliday's ability to understand, remember, and carry out instructions was not impacted by her mental health impairments. Tr. 501. Dr. Ruch further indicated that Holliday was only moderately limited from a mental standpoint in her ability to interact appropriately with the public, supervisors and coworkers and respond appropriately to work pressures in a usual work setting. Id. "Moderate" was defined in the document as "[t]here is a moderate limitation in this area, but the individual is still able to function satisfactorily." Tr. 500.

On August 27, 2008, Holliday had an appointment with Dr. Sullivan regarding "ongoing right buttocks and leg pain" which "waxes and wanes in severity." Tr. 610. Holliday reported that her pain" is worsened by prolonged sitting or prolonged walking" but that she had no weakness, numbness, or tingling sensations. Id. Other than "tenderness in the area of the sciatic notch" the reported objective physical examination findings were normal, including Holliday had a negative straight leg raising test. Id. Dr. Sullivan's assessment was that Holliday suffered from sciatica and referred her to physical therapy. Id.

On August 28, 2008, Richard W. Williams, Ph.D., a psychologist, reviewed Holliday's medical records and Dr. Ruch's report on behalf of the Bureau of Disability Determination and concluded that Holliday suffered from affective, anxiety, personality

24

and substance addiction disorders but that Holliday's impairments did not meet or equal the requirements of a listed mental health impairment. Tr. 503-515 and 518. Dr. Williams in his assessment of whether Holliday met or equaled a listing concluded that Holliday had no mental health restrictions with respect to her activities of daily living; moderate limitations with respect to social functioning; mild limitations with respect to maintaining concentration, persistence of pace; and no repeated episodes of decompensation each of an extended duration. Tr. 513. Dr. Williams in his assessment of Holliday's mental residual functional capacity concluded that Holliday was only moderately limited in her ability to maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors. Tr. 516-517. Dr. Williams stated that Holliday "does suffer with some emotional problems but they do not appear severe enough to prevent [her] from working." Tr. 518.

From September 2 through October 2, 2008, Holliday attended nine physical therapy sessions and was a "no show" at one session. Tr. 597-599 and 668-678. At a session on September 25th Holliday reported right buttock pain of 7 on a scale of 1 to 20.[35] Tr. 670. The physical therapist's assessment on that date was as follows: "Patient had fair tolerance of manual stretches with no reports of increased pain noted upon

35. Oddly the assessment of Holliday's pain at the prior physical therapy sessions was on a scale of 1 to 10 and she rated her pain on one occasion 8/10 and on 4 occasions 6/10. At this session, however, the notes specifically indicate "[p]atient reports with 7/20 R buttock pain currently." Tr. 670. This would represent a clear improvement in her pain level. However, at the subsequent sessions Holliday reported pain of 6 on a scale of 1 to 10. Tr. 668 and 670.

25

completion of session. Patient continues to have minimal pain relief with heat and stim[ulation]." Id. On October 2nd the physical therapist's assessment was as follows: "At this time patient has demonstrated good progress with regards to decreased tenderness to palpation, increased lumbar [active range of motion] with decreased symptoms, and self management of symptoms. Despite these improvement patient continues to have significant pain levels[36] with the only thing helping to reduce the pain in therapy [is] the moist heat and stimulation. [Patient] would like to continue therapy sessions at least until she is scheduled with a specialist. Therapist to call and obtain a new script as soon as able." Tr. 669.

On September 29, 2008, Holliday was examined by Phuoc Le, M.D., on behalf of the Bureau of Disability Determination. Tr. 519-525. After conducting a clinical interview, a physical examination and a mental status examination, Dr. Le concluded that Holliday suffered from (1) bipolar affective disorder with depression; (2) chronic anxiety; (3) obstructive sleep apnea, being treated with CPAP; (4) morbid obesity; (5) essential hypertension; (6) right hip and buttock pain, possibly due to sacroiliac joint dysfunction; (7) history of polysubstance abuse; and (8) tobacco dependence. Tr. 524. Dr. Le observed that Holliday "walk[ed] and move[d] independently" and she had no obvious spinal deformities or tenderness. Tr. 523. Holliday's gait and station were coordinated and normal; she could perform heel and toe walking;[37] the Romberg sign was negative;[38]

36. This portion of the assessment appears to be based in part on Holliday's subjective complaints.

37. The heel walk test requires the patient to walk on his or her heels. The inability to do so suggests L4-L5 nerve root irritation. The toe walk test requires the patient to walk on his or her toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical
(continued...)

26

her hand grip was 100% bilaterally; she had normal muscle strength throughout; her sensation and reflexes were normal; she had a negative straight leg raising tests on the left but positive for pain on the right buttock at a 60 degree angle in the sitting position. Tr. 524.  Furthermore, other than lumbar flexion which was reduced from 90 degrees to 70 degrees, Holliday's range of motion was normal throughout, including her neck, shoulders, elbows, wrists and  knees. Tr. 528-529.  In a document entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" Dr. Le found that Holliday had the ability to perform at least a limited range of light work. Tr. 526-527.  With respect to the mental status examination Holliday was pleasant, alert and cooperative; she was well-groomed and maintained good eye contact; her affect was full and appropriate; her speech was fluent and non-pressured; her thought processes were coherent; her judgment and insight were intact; she was oriented to person, place and time; and she did not report hallucinations, delusions, paranoia, or suicidal thoughts. Tr. 524.    Also, on September 29, 2008, Holliday underwent an x-ray of the pelvis which revealed an intact pelvis, no evidence of acute fracture and normal soft tissues. Tr. 609.

On October 9, 2008, Holliday had an appointment with Dr. Sullivan regarding her ongoing right buttock and sciatica pain. Tr. 608.  The only objective physical examination findings were that Holliday was "[e]xquisitely tender in the right buttocks around the sciatic notch" and she had "[l]imited [range of motion] because of

37.   (...continued)
Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed June 5, 2015).

38.   Romberg test is a neurological test to detect poor balance. It detects the inability to maintain a steady standing posture with the eyes closed.

pain." Id. Dr. Sullivan's assessment was that Holliday suffered from "[r]ight buttocks and leg pain due to sciatica" and he prescribed pain medications and referred Holliday to a pain management clinic. Id.

On October 31, 2008, based on a referral apparently from Dr. Sullivan, Holliday was evaluated regarding her right buttock pain by Michael W. Gish, M.D., an orthopedist, at Orthopedic Associates of Lancaster. Tr. 595-596. After conducting a clinical interview and physical examination and reviewing x-rays of Holliday's pelvis and an MRI of her lumbar spine, Dr. Gish's impression was that Holliday suffered from "[o]ngoing right buttock pain of unclear etiology." Tr. 596. Dr. Gish ordered an MRI of Holliday's pelvis and stated as follows: "If this is negative for any significant pathology. I would not have anything further to recommend since she has been through physical therapy and treated medically for pain." Tr. 595-596.

The MRI was performed on November 1, 2008, at the Lancaster General Hospital and revealed the following: (1) no indication of proximal hamstring tendon tear or evulsion; (2) likely mild gluteal tendinopathy/trochanteric bursitis; and (3) a large cystic lesion, possibly adnexal in origin, in the pelvic viscera. Tr. 692. The physician interpreting the MRI recommended further evaluation of the cystic lesion using ultrasound. Tr. 692-693.

On November 4, 2008, Holliday had a follow-up appointment with Dr. Gish at which Holliday reported that her pain continued without significant change and was primarily over the buttock and posterior thigh. Tr. 594. After performing a physical examination and reviewing the MRI scan, Dr. Gish's diagnostic assessment was as follows: "Right buttock pain of unclear etiology. This has been fully evaluated including a

28

neurosurgical evaluation with a repeat lumbar MRI, lumbar spine and pelvis x-rays, and a pelvic MRI without an obvious etiology of her pain." Id. Dr. Gish recommended "continuation of medical treatment and possibly revisiting physical therapy" and he further noted that there was "no surgical indication at this point." Id. Dr. Gish, however, had a discussion with Holliday regarding the cystic lesion and the necessity of following up with Dr. Sullivan to have that condition evaluated with a pelvic ultrasound. Id.

On November 13, 2008, Holliday had an appointment with Dr. Sullivan at which she continued to complain of "a lot of pain originating in her buttocks, shooting down into her leg[.]" Tr. 607. The results of a physical examination were essentially normal other than Holliday had mildly elevated blood pressure and "tenderness in the right buttocks and down into the leg around the sciatic nerve." Id. Dr. Sullivan's diagnostic assessment was that Holliday suffered from (1) persistent right buttocks and leg pain probably caused by sciatica; (2) a very large pelvic cyst (ovarian cyst) in need of further evaluation; (3) mildly elevated blood pressure but overall pretty stable; (4) tobacco abuse; and (5) depression and anxiety. Id. Dr. Sullivan prescribed medications, referred her to physical therapy and referred her to a gynecologist for evaluation of the ovarian cyst. Id.

On December 8, 2008, Jay Shaw, M.D., reviewed Holliday's medical records on behalf of the Bureau of Disability Determination and concluded that Holliday suffered from obesity, degenerative disc disease, and menorrhagia but that she had the physical capacity to engage in a limited range of medium work. Tr. 530-536.

Holliday in January, 2009, was evaluated by a gynecologist who ordered an ultrasound and subsequently recommended surgery. Tr. 591-593 and 604. Surgery to

29

remove an ovarian cyst was performed on February 16, 2009, without complications and was uneventful. Id.

On February 16, 2009, Holliday had an appointment with Dr. Sullivan at which time Holliday complained of worsening right lower back, buttocks and hip pain. Tr. 604. Holliday stated that the pain did not radiate down into her legs. Id. Holliday denied any numbness, tingling or weakness in her lower legs. Id. A physical examination revealed that Holliday had decreased range of motion at the hip partly caused by her subjective complaints of pain and party because of her "large body habitus." Id. Holliday had no tenderness over the spine but she was tender in the paralumbar region, the buttocks and the lateral hip on the right side. Id. Straight leg raising tests were negative and she had normal strength and reflexes in her bilateral lower extremities. Id. Dr. Sullivan's diagnostic assessment was that Holliday suffered from "right-sided low back pain . . . probably sciatica albeit very severe" and he prescribed pain medications. Id.

At a follow-up appointment with Dr. Sullivan on March 4, 2009, Holliday continued to complain of right-sided back and buttock pain. Tr. 603. Holliday reported that she was taking the narcotic pain medication Dilaudid, two milligrams three to four times per day. Id. Other than tenderness in the right buttocks area, the reported objective physical examination findings were normal, including straight leg raising tests were negative. Id. Dr. Sullivan's diagnostic assessment remained the same and he refilled Holliday's prescription for Dilaudid, prescribed the antidepressant amitriptyline (Elavil) and referred her to physical therapy. Id. On April 7, 2009, Holliday told Dr. Sullivan that she was noticing improvement as a result of the physical therapy and Dr.

30

Sullivan's treatment notes of May 7, 2009, indicate that Holliday continued with physical therapy and was "making progress." Tr. 790-791.

A physical examination performed by Dr. Kager on May 13, 2009, revealed that Holliday's gait and station were normal; she had normal muscle strength and tone in the upper and lower extremities; she had normal sensation and reflexes; and straight leg raising tests were negative. Tr. 723.

On May 21, 2009, Holliday was examined by Tony T. Ton-That, M.D., a physical medicine and rehabilitation specialist. Tr. 735-736. During that appointment Holliday reported that she had smoked a pack of cigarettes per day for 12 years but denied any history of alcohol use. Tr. 736. The results of a physical examination were essentially normal other than Holliday's blood pressure was elevated at 145/105 and she was obese although her weight had decreased to 300 pounds. Id. Holliday walked with a normal gait and had normal muscle strength, sensation and coordination in the upper and lower extremities. Id.

On June 5, 2009, Holliday had an appointment with Dr. Sullivan at which Holliday complained of severe pain in her right buttocks radiating down the back of her leg. Tr. 770. Holliday reported less improvement resulting from her physical therapy[39]

_____

39. From March 16, 2009, through May 22, 2009, Holliday attended 13 physical therapy sessions. Tr.650 and 652-667. She cancelled 5 and was a "no show" at one. Tr. 650-651. She was discharged from the program on May 28, 2009, as the result of a phone call from her during which she stated that "she would be unable to continue with the therapy at this time due to personal reasons." Tr. 651. At the last physical therapy appointment on May 22, the physical therapists assessment was as follows: "The patient was seen for re-assessment today and strength has not changed since the initial evaluation. Patient is reporting no improvement in pain at this time. Patient has improved in [range of motion] in sidebending. She is able to complete some stretching to decrease pain, however, may of the stretches and exercises increase pain.

(continued...)

31

and inquired regarding other treatment options. Id. The reported objective physical examination findings were normal, including she had normal range of motion with respect to her musculoskeletal system. Id. Dr. Sullivan prescribed medications, including Dilaudid, and recommended that she continue with physical therapy. Id.

A physical examination of Holliday performed by Dr. Kager on July 1, 2009, revealed that her gait and station were normal; her muscle strength and tone in the upper and lower extremities were normal; her sensation and reflexes were normal; she had negative straight leg raising, Babinski and Hoffman's tests; her coordination was normal; there was no evidence of short or long term memory loss; and she had a normal attention and concentration span. Tr. 712. At the end of July, 2009, Holliday was examined by Dr. Sullivan with similar objective findings. Tr. 768.

On October 19, 2009, Holliday had an appointment with Kristi L. Yacklovich-Menicheschi, a certified registered nurse practitioner. Tr. 645-646. A physical examination revealed that Holliday's blood pressure was elevated at 139/75; she weighed 350 pounds making her morbidly obese; she had some lower extremity edema; she ambulated with a limp; the range of motion of her lumbar spine was significantly restricted with respect to bending forward; she had diminished sensation to light touch in the right posterior thigh; she had reduced motor strength in the right leg; her deep tendon reflexes were normal throughout; she had a positive straight leg raising test on the right; she had tenderness in the lumbar paraspinal region and in the midline of the lower

---

39.  (...continued)
Recommend continued therapy with re-assessment in 2 weeks. If symptoms have not improved in that time, will refer patient back to physician for pain management." Tr. 652.

32

lumbar spine; she had palpable pain in the gluteal region; and she had tenderness in right sciatic notch. Tr. 646. Ms. Yacklovich-Menicheschi after performing the physical examination recommend epidural steroid injections. Id.

On October 23, 2009, Holliday underwent an MRI of the lumbar spine which revealed (1) recurrent disc extrusion at L5-S1 level of the lumbosacral spine causing severe narrowing of the right spinal canal and lateral recess and (2) progressive neuroforaminal narrowing at the L4-L5 level of the lumbar spine. Tr. 734.

On November 2, 2009, Holliday had an appointment with Dr. Sullivan at which Holliday complained of a sore throat. Tr. 764. The results of a physical examination were normal other than it was noted that there was oropharyngeal edema[40] present. Id. Holliday's musculoskeletal range of motion was normal throughout and she had no lower extremity edema. Id. The diagnostic assessment was that Holliday suffered from viral pharyngitis and she was advised to take over the counter cold and cough medications. Id. Dr. Sullivan, also, referred Holliday to a neurosurgeon based on the results of the recent MRI of her lumbar spine. Id.

On November 16, 2009, Holliday had an appointment with Dr. Kager who after performing a clinical interview, physical examination and reviewing the recent MRI of Holliday's lumbar spine concluded that Holliday suffered from severe lumbar radiculopathy and a new fairly large rightward disc herniation at the L5-S1 level of the lumbosacral spine. Tr. 707-709. Dr. Kager outlined Holliday's options, including additional physical therapy, but he noted that "[a]t this point, based on the length of her

---

40. Oropharyngeal edema is an abnormal collection of fluid under the skin in the back of the throat.

33

symptoms and the MRI appearance, [] surgical intervention is reasonable[.]" Tr. 708. He discussed with Holliday the option of "a right L5-S1 re-exploration with diskectomy." Tr. 708-709. Holliday informed Dr. Sullivan that she wanted to consider her options but subsequent to the appointment notified Dr. Kager that she wanted to proceed with the surgery which was scheduled for and performed on January 5, 2010, without any complications. Tr. 647.

On February 5, 2010, Holliday had a follow-up appointment with Dr. Kager at which time she stated that "she [had] persistent soreness in her low back around the area of the incision" and "she [] still [had] pain down through her right leg but that the pain now only [went] to the knee where as preoperatively it had gone all the way to the foot." Tr. 700. Holliday reported that she had been taking the narcotic pain medication OxyContin (oxycodone) less often. Id. Dr. Kager observed that Holliday's surgical incision was healing well. Id. Dr. Kager advised Holliday that some of her persistent pain in her right leg may simply take time to resolve as the nerve is still healing and that her low back should also improve. Id. Dr. Kager refilled Holliday's prescription for the narcotic OxyContin, prescribed the muscle relaxant Soma and referred Holliday to physical therapy. Id. Dr. Kager advised her to continue on a regular home exercise program based on what the physical therapist recommends and encouraged her to quit smoking.[41] Id.

---

41. At the time of the surgery Holliday was smoking one pack of cigarettes per day. It is well recognized that "[q]uitting smoking and other tobacco products before surgery can improve [an individual's] recovery time and outcome after surgery." Smoking and surgery, MedlinePlus, U.S. National Library of Medicine, http://www.nlm.nih.gov /medlineplus/ency/patientinstructions/000437.htm (Last accessed June 4, 2015).

On February 23, 2010, Holliday had an appointment with Dr. Sullivan regarding complaints of back pain and sciatica, diarrhea and increasing agitation which she reported "was related to not having her pain medications." Tr. 759. Dr. Sullivan noted that Dr. Kager had prescribed pain medication for Holliday and that Holliday admitted filling those prescriptions but she ran out because an individual living with her was taking her medications and when this individual became violent that she had to have the police forcefully remove this individual from her home. Id. Holliday also reported that "overall" her back pain was "a lot better." Id. Dr. Sullivan apparently accepted Holliday's explanation because although he states in his treatment notes that he was hesitant to refill her medications, after Holliday completed a narcotics contract and he went over with Holliday his expectations regarding her narcotic usage, he prescribed both OxyContin and Dilaudid for Holliday's pain. Tr. 759. No objective physical examination findings were recorded by Dr. Sullivan at this appointment. Id.

On April 16, 2010, Holliday had an appointment with Dr. Sullivan at which Holliday complained of worsening pain over the last several weeks. Tr. 758. The pain was located over her lateral hip. Id. Holliday stated that her back pain had improved and that she was still taking narcotic pain medications and smoking. Id. Holliday denied any numbness, tingling or weakness. Id. The results of physical examination were normal, including she had normal range of motion and normal strength. Id. However, she did exhibit tenderness over the hip area (the greater trochanter). Id. Dr. Sullivan continued to prescribed narcotic pain medications. Id.

At an appointment with Dr. Sullivan on June 22, 2010, Holliday complained of back and hip pain and reported that she had been completely without pain medications

35

for two days. Tr. 757. She stated that the "pill bottle containing her dilaudid tablets was stolen out of her car" and that a girlfriend had been taking her pain medications. Id. She also stated that a police report had been filed but she did not have a copy. Id. Dr. Sullivan did not record any objective physical examination finding other than Holliday's blood pressure which was elevated at 146/100. Id.   Dr. Sullivan refilled Holliday's pain medication prescriptions because he "believe[d] she [was] being truthful" and he did phone a police officer and leave a message asking that the police officer return his call to confirm Holliday's story.[42] Id.

The next items that we encounter are records of a 10-day inpatient drug detox program that Holliday attended at White Dear Run/Cove Forge Behavioral Health System from July 11 to 21, 2010. Tr. 913-929. Holliday was "admitted into the Detox unit due to her opiate dependency." Tr. 913. Holliday who was 33 years of age at the time of admission reported that she first used opiates at age 31 and cocaine at age 30 and she was currently using 6 to 8 bags of heroin and 4 mg of Dilaudid and $50 worth of cocaine daily. Id. Holliday stated that she last used heroin and cocaine on July 8, 2010. Id. At the time of admission Holliday was diagnoses as suffering from opiate dependence and bipolar disorder by history and given a GAF score of 30. Tr. 913-914. Her GAF score on July 16, 2010, was 45. Tr. 929.

While attending the 10-day detox program Holliday underwent a physical examination on July 12, 2010. Tr. 917-923. The physical examination revealed that Holliday weighed 326 pounds; her blood pressure was 164/100; she was well developed

---

42.    There is no indication in the administrative record that Holliday's story was confirmed.

and well nourished, in no acute distress; she had no gait problems and was able to ambulate independently; she had no spine or periphery joint deformities; she had full range of motion; she had no muscle spasm, pain or tenderness; she had no tender or swollen joints; her upper and lower extremities had adequate range of motion and pulses; she had no edema, varicosities or tenderness in the extremities; she had no sensory deficits or motor weakness; her deep tendon reflexes were normal; and she had a negative Romberg sign and normal finger to nose test. Tr. 918-922.

A mental status examination revealed that she was oriented to time, place, person and recent events; she had intact cognition; her speech was clear, with normal rate and tone; she had no overt psychotic symptoms; and she had no suicidal or homicidal ideations. Tr. 922.

Holliday's discharge summary from the detox program indicates that during the course of treatment she was able to gain some limited insight into the nature of her addiction and her progress was fair. Tr. 913. At discharge it was recommended that she refrain from the use of all mood and mind altering substances; she attend a 12-step support group meeting on a daily basis, obtain a sponsor, obtain a home group and begin working the 12 steps of Alcoholic Anonymous and Narcotics Anonymous; and she begin intensive outpatient therapy through HSA Counseling of Lancaster on July 26, 2010 at 4 p.m. Id. Holliday's discharge diagnosis was opiate dependence and history of bipolar disorder and she was given a GAF score of 62, representing mild symptoms. Tr. 915.

There is no indication in the administrative record that Holliday attended the intensive outpatient therapy at HSA Counseling of Lancaster. The next medical record

37

we encounter relates to a visit by Holliday to the emergency department of Lancaster General Hospital on August 9, 2010, at which time Holliday complained of severe low back pain and right leg pain. Tr. 635-636. The record indicates that Holliday drove herself to the hospital. Tr. 636. Holliday told the emergency department personnel that "she was on Dilaudid from her family doctor near Philadelphia [and] recently moved here because of abusive relationship and [was] living with a friend." Id. Holliday denied suffering from a headache, paralysis or paresthesias. Id. Her current medications were listed as Verapamil and Tenoretic, which are used to treat high blood pressure. Id. The results of a physical examination were essentially normal other than Holliday had minimal tenderness over the lumbar spine and the right sacroiliac area. Id. Straight leg raising tests "did not significantly increase her pain" and her "strength seemed to be okay." Id. Holliday was given a Toradol injection[43] and a prescription for Percocet and discharged from the hospital with instructions to follow-up with a local clinic. Id.

On August 16, 2010, Holliday had an appointment with Dr. Sullivan at which she complained of a nasal or sinus problem. Tr. 755-756. Other than signs and symptoms of an upper respiratory infection, the results of a physical examination were essentially normal. Id. There were no objective adverse musculoskeletal or neurological findings reported. Id.

On September 21, 2010, Holliday underwent a psychiatric evaluation by Donald L. Rynier, M.D., a staff psychiatrist at Philhaven, located in Mt. Gretna, Pennsylvania. Tr. 858-861. After conducting a clinical interview and a mental status

---

43. Toradol is a nonsteroidal anti-inflammatory drug used on a short-term basis to treat moderate to severe pain. Toradol, Drugs.com, http://www.drugs.com/toradol.html (Last accessed June 5, 2015).

examination, Dr. Rynier's assessment was that Holliday suffered from posttraumatic stress disorder; depression; past history of bipolar disorder which could not be confirmed; recent diagnosis of "Borderline Personality Disorder;" polysubstance abuse; and alcohol abuse stated to be in remission. Tr. 860. Dr. Rynier gave Holliday a current GAF score of 50. Id. In describing Holliday's drug abuse Dr. Rynier stated as follows: "[S]he had difficulties with drugs and alcohol and seems to significantly minimize this, at least in the view of the evaluator. She indicates she was 'self-medicating' and leaves it at that. She indicates that she snorted some heroin but in the past had been mainlining it. She indicates that she used "crack" several years ago and some alcohol less than 30 days ago. She was at White Deer for a period of time in Mid-July. She indicates she is attending three meetings per week for D&A [] and is also being seen by a D&A counselor." Tr. 859. In summarizing the mental status examination Dr. Rynier stated that Holliday "presents as an obese woman who is sullen. She is neither hallucinating nor delusion. She denies any active suicide ideation on account of her child. She seems to be adequately able to describe her predicament, but given that she has been able to take some college courses, she seem to be short in detail. It is almost as if she gives a few pieces of information and expects that should be adequate." Id. Dr. Rynier concluded that Holliday's mood was neutral although somewhat solemn but she certainly was not manic. Id.

On September 30, 2010, Holliday visited the emergency department at the Lancaster General Hospital complaining of flea bites. Tr. 633-635. When the emergency

department physician reviewed Holliday's systems,[44] Holliday denied any musculoskeletal or neurological problems. Tr. 633-634. Other than what appeared to be flea bites, the results of a physical examination were normal, including that Holliday had normal upper and lower extremities. Tr. 634-635. It was reported that Holliday was oriented to person, place and time and had a normal affect. Tr. 634. Holliday's blood pressure was elevated at 163/100 and her current medications were listed as Tenoretic, Verapamil, Celexa and Seroquel.[45] Tr. 634-635.

On December 28, 2010, Holliday had an x-ray of the lumbar spine performed at the York Hospital which revealed "[m]ild lumbar spondylosis,[46] with facet arthropathy and degenerative disc space narrowing in the lower lumbar spine." Tr. 1-47.

On or about January 7-8, 2011, Holliday visited the emergency department at Memorial Hospital in York, Pennsylvania, complaining of back pain. Tr. 1017-1025. Holliday arrived at the hospital by motor vehicle and was observed walking with a steady gait. Tr. 1017 and 1019. Holliday reported smoking 1 pack of cigarettes per day but denied using drugs or alcohol. Tr. 1019. The results of a physical examination were essentially normal other than Holliday had mild tenderness and palpable pain along the

---

44. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed June 5, 2015).

45. Seroquel is an antipsychotic medication used to treat schizophrenia but it is also used to treat bipolar disorder and major depressive disorder. Seroquel, Drugs.com, http://www.drugs.com/seroquel.html (Last accessed June 5, 2015).

46. Degeneration of the vertebrae and intervertebral discs is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae. The term is frequently used to describe osteoarthritis of the spine.

40

right paraspinal muscles. Tr. 1019-1020. Holiday's speech was clear; she was oriented to person, place and time; she had a normal affect; and she responded appropriately to questions. Tr. 1020. Holliday was advised, inter alia, to avoid any activity that puts stress on her back and to use ice packs on her back for 5 to 15 minutes at a time, and discharged from the hospital. Tr. 1021.

Holliday returned to emergency department at Memorial Hospital on January 25, 2011, with similar complaints after having lifted a heavy trash bag. Tr. 1006-1007. The results of a physical examination were essentially normal other than Holliday had tenderness over the right sacroiliac joint; she had mild tenderness of the lumbar spine; and she had mild pain with straight leg raising on the right. Tr. 1008. Holliday's strength, sensation and reflexes were normal and she was oriented to person, place and time. Id. Holliday was prescribed pain medications and discharged with instructions to follow-up with one of the clinics in the area. Id.

On February 28, 2011, Holliday visited the emergency department at Memorial Hospital complaining of a painful left wrist. Tr. 998-999. Holliday reported that she slipped and fell on a bathroom floor landing on her wrist 2 days prior to the visit. Id. A physical examination performed by an emergency department nurse revealed no obvious injury. Tr 999. Holliday had no edema, swelling or tenderness in the extremities; she was well nourished, alert and oriented to person, place and time; and she exhibited no acute distress or obvious discomfort. Id. Holliday was observed leaving the emergency department waiting room and walking to her car before she had been fully evaluated. Tr. 1000.

On March 24, 2011, Holliday was evaluated by Barry B. Hart, Ph.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 872-877. After conducting a clinical interview and a mental status examination, Dr. Hart concluded that Holliday suffered from bipolar disorder, most recent episode mixed; polysubstance abuse, sustained partial remission; and borderline personality disorder. Tr. 877. Dr. Hart could not rule out posttraumatic stress disorder. Id. He gave Holliday a GAF score of 50. Id. During the clinical interview Holliday admitted not taking any psychotropic medications for approximately three months because of a recent move. Tr. 875. Dr. Hart reported that Holliday interacted cooperatively, but tended to avoid eye contact; she spoke coherently; and she exhibited average intelligence. Tr. 874 and 876. Dr. Hart stated that Holliday's "concentration was reasonably good" finding that she was able to perform serial sevens and recite the months of the year backwards without errors. Tr. 876. Dr. Hart opined that "her concentration should not be a major impediment to her ability to hold down a job," and recommended that she receive therapy and recommence taking psychotropic medications. Tr. 877. Dr. Hart completed a questionnaire indicating that Holliday would have no difficulty understanding, remembering, and carrying out short, simple instructions; moderate difficultly in understanding, remembering and carrying out detailed instructions; moderate to marked difficulty in making judgments on simple work-related decisions; moderate to marked difficulty interacting appropriately with the public, supervisors and coworkers and responding appropriately to changes in a

routine work setting; and marked[47] difficulty responding appropriately to work pressures in a usual work setting. Tr. 872.

On April 5, 2011, Emanuel Schnepp, Ph.D., a psychologist, reviewed Holliday's medical records and Dr. Hart's report on behalf of the Bureau of Disability Determination and concluded that Holliday suffered from affective, anxiety, personality, substance addiction and spine disorders but that Holliday's impairments did not meet or equal the requirements of a listed mental health impairment. Tr. 155-156. Dr. Schnepp in his assessment of whether Holliday met or equaled a listing concluded that Holliday had mild mental health restrictions with respect to activities of daily living, moderate limitations with respect to social functioning and maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of an extended duration. Tr. 156. Dr. Schnepp in his assessment of Holliday's mental residual functional capacity concluded that Holliday did have several moderate limitations in her mental abilities, including the ability to maintain attention and concentration for extended periods, but that Holliday could understand, retain and follow simple job instructions and carry them out; she could perform one and two step tasks; her basic memory processes were intact for both recent and remote events; she could perform simple, routine, and repetitive work in a stable environment; she could make simple decisions and work within a schedule at a consistent pace for routine and repetitive work; she could maintain concentration and attention for reasonably extended periods of time when performing routine and repetitive work; she was able to maintain regular attendance and be punctual within reasonable

---

47. "Marked" is defined as "[t]here is serious limitation in this area. The ability to function is severely limited but not precluded." Tr. 500.

43

expectations when provided with a consistent work schedule; she could maintain an ordinary work routine without special supervision; she was capable of taking appropriate precautions to avoid hazards and she could exercise appropriate judgment in the workplace; and she could function in production-oriented jobs requiring little independent decision-making. Tr. 158-160.

On June 8, 2011, at a 11:18 p.m (2318), Holliday visited the emergency department at Memorial Hospital complaining of left hip pain. Tr. 984-988. Holliday reported that she was walking in a river when she twisted her leg and the pain increased shortly after that incident. Tr. 987. A clinical interview revealed that Holliday was smoking 1 ½ packs of cigarettes per day and occasionally drinking alcoholic beverages but she denied any drug abuse. Id. The results of physical examination were normal except she was obese; she had decreased sensation on the top of the left foot and left great toe compared to the right foot; she had mild hypertonicity and tenderness at the lumbar sacral paravertebral musculature left side greater than right but with full range of motion; she had tenderness to palpation over the left mid-gluteus region (buttock) and ischial tuberosity(hip region); and straight leg raising was positive on the left for radiculopathy at the posterior aspect of the thigh and calf but negative on the right. Tr. 987-988. An x-ray was performed which revealed no fractures. Tr. 988. The diagnostic assessment was that Holliday suffered from sciatica and she was prescribed the narcotic pain medication oxycodone and discharged from the hospital on June 9, 2011, at 6:40 a.m. (0640) in a stable and improved condition. Id.

On September 3, 2011, Holliday visited the emergency department at Memorial Hospital complaining of an abscess on her right leg. Tr. 1211-1218. When

44

emergency department personnel reviewed Holliday's systems Holliday denied back pain and did not report any joint, neck or muscle pain. Tr. 1213. The results of physical examination were normal other than the signs and symptoms associated with the abscess. Tr. 1214.  There were no objective adverse musculoskeletal findings reported. Id.  After the abscess was incised and drained, she received a prescription for an antibiotic and oxycodone and was discharged from the hospital. Id.

On September 6, 2011, Holliday initiated care with Lavanya Bojja, M.D., of Wheatlyn Family Medicine, located in Manchester, Pennsylvania. Tr. 1048-1050. Holliday reported that she had back pain radiating into her lower right extremity which improved following surgery, but now she had pain radiating into her lower left extremity. Tr. 1048. The results of physical examination were normal other than her blood pressure was elevated at 165/104, she was morbidly obese and she had pain when twisting her hips. Tr. 1049-1050.  Holliday had no tenderness in the back and she had full range of motion (forward flexion, right flexion, left flexion and extension); she had negative bilateral straight leg raising tests; her deep tendon reflexes were normal; she had normal lower extremity muscle strength; and she had a normal station and gait. Tr. 1050.

On November 16, 2011,   Holliday visited the emergency department at Memorial Hospital complaining of pain associated with a broken lower left molar. Tr. 1201.  This record is only relevant to the extent that it reveals that Holliday was neurologically intact with normal reflexes, motor strength and sensation. Tr. 1202.

In December 2011, Holliday visited the emergency department at Memorial Hospital three times (December 27th, 29th and 31st ) for low back pain after lifting and "helping move furniture" on or about December 23, 2011. Tr. 931-933, 1172, 1174, 1180

45

and 1190. Upon examination, Holliday had no tenderness in her lumbar spine and full motor strength, intact sensation, and normal reflexes in her extremities. Tr. 934 and 1174. Holliday was given narcotic pain medication and instructed to follow-up with a pain management physician as soon as possible. Tr. 934.

On December 29, 2011, Holliday had an appointment with Michael J. Sicuranza, M.D., of Orthopaedic & Spine Specialists regarding low back pain. Tr. 1071-1072. At that appointment Holliday stated that she had pain for 1 month and did not mention recently lifting furniture. Id. After conducting a clinical interview and a physical examination and reviewing x-rays, Dr. Sicuranza's diagnostic assessment was that Holliday suffered from degenerative lumbar disc disease with lumbar radiculitis, primarily right sided. Tr. 1072. Dr. Sicuranza prescribed the narcotic pain medication Vicodin but noted that this would be the last pain prescription from his practice until she had a consultation follow-up with a pain management group. Id. Dr. Sicuranza further stated that Holliday was "able to ambulate and perform activities of daily living." Tr. 1071.

On December 31, 2011, Holliday had an x-ray of the lumbar spine which revealed "[m]inor degenerative changes of the lumbar spine with no subluxation[48] or fracture. Tr. 1422.

On January 10, 2012, Holliday sought treatment from Michael Furman, M.D., of Orthopaedic and Spine Specialist, PC, Center for Pain Management & Rehabilitation, for back pain radiating into her right lower extremity. Tr. 1068-1070. Holliday had intact muscle tone, motor strength, sensation, and reflexes in her lower

---

48.    Subluxation is "an incomplete or partial dislocation." Dorland's Illustrated Medical Dictionary, 1791 (32nd Ed. 2012).

extremities. Tr. 1069. Dr. Furman reviewed Holliday's lumbar MRI which showed L5-S1 degenerative changes, status post lumbar decompression, but no spondylosis. Tr. 1069. Dr. Furman concluded that the source of Holliday's pain was probably right ischial bursitis and recommended an injection, which Holliday received on January 11, 2012. Tr. 1069-1070 and 1079-1080. Dr. Furman further noted that Holliday "is able to ambulate and perform activities of daily living without devices." Tr. 1068.

On January 17, 2012, Holliday underwent an MRI of the lumbar spine at the request of Dr. Furman. Tr.1040-1041. The impression of the physician interpreting the MRI was as follows:

> 1. Limited study because of patient body habitus.
>
> 2. Postoperative changes at L5-S1 with laminectomy. Abnormal soft tissue present in the right lateral recess which does not enhance consistent with a moderate size disc entrusion. Please compare to any previous exams. There is mass effect upon the right anterior aspect of the thecal sac.
>
> 3. Moderately severe central stenosis and moderate bilateral foraminal narrowing at L4-5[.]

Tr. 1041. Subsequently, on March 23, 2012, Dr. Furman administered an epidural steroid injection at the L5 level of Holliday's spine. Tr. 1081-1082. The report of this procedure indicates that Holliday tolerated it well. Tr. 1081. However, the administrative record contains no other treatment notes or records from Dr. Furman other than a letter dated April 16, 2012, address to Holliday advising her that she failed to appear at a scheduled appointment on April 16, 2012. Tr. 1090.

On January 23, 2012, Holliday visited the emergency department at Memorial Hospital complaining of tooth pain. Tr. 1159-1162. Holliday arrived at the

hospital by motor vehicle and was observed walking without difficulty. Tr. 1159 and 1161.

An emergency department nurse observed that Holliday was well nourished, alert,

oriented to person, place and time, and in no acute distress or obvious discomfort. Tr.

1161. When an attending physician reviewed Holliday's systems, Holliday denied fatigue,

back pain, joint pain, sensory deficits and motor deficits. Id. Other than an obvious

dental problem ( a broken tooth) and elevated blood pressure, the results of a physical

examination were normal. Tr. 1161-1162. Holliday's speech was clear; she was oriented

to person, place and time; her affect was normal and she responded to questions

appropriately; her motor strength and sensation were normal; she had good pulses and

no edema, swelling and tenderness in the extremities; and she had no tenderness in the

back. Tr. 1162. Holliday was prescribed penicillin and discharged from the hospital with

instructions to follow-up with a dental clinic. Tr. 1159.

On February 7, 2012, Holliday had an appointment with Dr. Bojja at

Wheatlyn Family Medicine regarding her blood pressure and swollen feet. Tr. 1053-1055.

Holliday also reported that her depression was getting worse but noted that she had not

been taking her psychiatric medications. Tr. 1053-1054. Other than obvious morbid

obesity, slightly elevated blood pressure and some edema in the bilateral lower

extremities, the results of a physical examination were normal. Tr. 1054-1055. Holliday

had normal deep tendon reflexes. Tr. 1055. There were no other neurological or

musculoskeletal objective findings recorded by Dr. Bojja and no indication that Holliday

complained about lower back or lower extremity pain. Tr. 1053-1055.

On March 1, 2012, Holliday had an appointment with Kevin B. St. John,

M.D., at Wheatlyn Family Medicine regarding a sore throat and symptoms of an upper

48

respiratory infection, including nasal congestion, cough, chest tightness, wheezing and headache. Tr. 1056-1057. Holliday denied ear pain (otalgia), nausea, vomiting, diarrhea, rash, and muscle pain (myalgias). Tr. 1056. Other than symptoms associated with an obvious upper respiratory infection, morbid obesity, and elevated blood pressure, the results of a physical examination were normal. Tr. 1057. There were no neurological or musculoskeletal objective findings recorded by Dr. St. John and no indication that Holliday complained about lower back or lower extremity pain. Tr. 1056-1057.

On March 9, 2012, Holliday visited the emergency department at Memorial Hospital complaining of low back pain and blood in stool. Tr. 1139-1148.   When an attending physician reviewed Holliday's systems, other than positive back and muscle pain and blood in the stool (hematochezia) the review was negative, including negative joint pain and negative anxiety. Tr. 1142-143. Holliday did not report any psychiatric symptoms. Id. A physical examination revealed that Holliday had moderate tenderness in the left paraspinal muscles with palpation producing pain. Tr. 1143. However, Holliday had normal muscle strength, good pulses and no swelling, tenderness or edema in the lower extremities. Id. She also had normal deep tendon reflexes and sensation throughout. Id. With respect to her mental status, her speech was clear; she was oriented to person, place and time; she had a normal affect; she denied thoughts of hurting herself or others; and she responded appropriately to questions. Tr. 1141 and 1143. Holliday was treated with pain medications, including Toradol and morphine, and discharged with the instruction to follow-up with her physician. Tr. 1143. At the time of discharge Holliday reported relief of her back pain and she was able to ambulate and bear weight. Id.

49

On March 16, 2012, Holliday had an appointment with Dr. Bojja at Wheatlyn Family Medicine regarding excessive sleeping apparently caused by depression and anxiety. Tr. 1058-1059. Other than obvious morbid obesity and elevated blood pressure, the results of a physical examination were normal. Tr. 1059. There is no indication that Holliday complained about lower back or lower extremity pain. Tr. 10580-1059. Dr. Bojja adjusted Holliday's pyschotropic medications and recommended that she seek psychiatric counseling. Tr. 1058.

On May 7, 2012, Holliday visited the emergency department at Memorial Hospital complaining of dental and back pain but no radicular symptoms. Tr. 1127-1132. During this encounter Holliday was observed walking without assistance. Tr. 1130. Other than obvious obesity, mild tenderness over the right lumbar paraspinal muscles and a low blood pressure of 92/53, the results of a physical examination were normal. Tr. 1129 and 1131. Holliday had negative straight leg raising tests; she had normal muscle strength and no tenderness, swelling or edema in the lower extremities; she had normal reflexes and sensation; her speech was clear; she was oriented to person, place and time; and she responded to questions appropriately. Tr. 1131. Holliday was prescribed tramadol and an antibiotic and instructed to follow-up with Orthopaedic & Spine Specialists and a dental clinic at the York Hospital. Tr. 1137.

Holliday returned to the emergency department at Memorial Hospital on May 8, 2012, complaining of worsening back pain. Tr. 1121. The attending physician noted that Holliday denied any swelling, seizures or lower extremity weakness; she denied joint pain and neck pain; she was able to walk without assistance in the emergency department; and she had no numbness or weakness. Id. Other than morbid

50

obesity, elevated blood pressure at 171/82 and tenderness to palpation over the right paraspinal lumbar area, the results of a physical examination were normal and essentially the same as reported on May 7th. Tr. 1122. Holliday was prescribed the pain medication Vicondin and discharged from the hospital with instructions to follow-up at the Memorial Hospital clinic in 2 to 3 days. Tr. 1125.

On May 11, 2012, Holliday underwent a one-time psychiatric evaluation by Alok Saharan, M.D., a psychiatrist at Wellspan Behavioral Health located in York, Pennsylvania. Tr. 886-889 and 1445-1446. During the clinical interview, Holliday reported, inter alia, that over the last 2 years she suffered from depression, fatigue and crying spells. Tr. 886. Holliday reported that she smokes one pack of cigarettes per day; she last used marijuana "a couple of months ago;" she became addicted to crack cocaine and opiates; and presently she was not using any illegal substances. Tr. 1446. Holliday outlined a history of sexual abuse during her formative years and complained of nightmares and flashbacks. Id. A mental status examination revealed that Holliday was fully conscious; she was alert and oriented to person, place and time; her speech was clear and understandable; her gait and posture were within normal limits; her personal hygiene was good; she reported a "good [mood] today;" her affect was not restricted; she had no suicidal or homicidal thoughts, intent or plan; she had no audio or visual hallucination, paranoia, or delusions; and she had no flight of ideas. Tr. 887. Dr. Saharan did note that Holliday had a generalized sense of helplessness and hopelessness and episodic irritability, lack of motivation and crying spells, and that her lack of ability to derive any pleasure from life predominated her clinical picture. Tr. 887-888. After performing the clinical interview and mental status examination, Dr. Saharan concluded

51

that Holliday suffered from a mood disorder, not otherwise specified; posttraumatic stress disorder, not otherwise specified; nicotine dependence; cocaine and opiate dependence in full sustained remission; cannabis dependence in early sustained remission; and cluster B personality traits;[49] and he gave Holliday a GAF score of 45. Tr. 888. Dr. Saharan could not rule out Borderline Personality Disorder. Id. Dr. Saharan advised Holliday to continue taking Lexapro and prescribed Wellbutrin and the antidepressant Trazodone for insomnia. Id. Dr. Saharan also appears to have referred her to psychotherapy although after this initial evaluation the administrative record contains only two Wellspan Behavioral Health Physician Progress notes dated June 25 and July 24, 2012. Tr. 1392-1393. The progress notes are barely legible but on June 25th it was stated that both her condition had improved and remained the same since the last visit and on July 24th that her condition had mildly improved since the last visit. Id. On both dates Holliday was alert and oriented to person, place and time; she had no suicidal or homicidal thoughts; and she denied any medication side effects and or substance abuse issues. Id. She also reported "good medication compliance" and a normal appetite and improved sleep. Id. On July 24th her affect was mildly anxious but she was cooperative and her intelligence and judgment were rated "fair - good." Tr. 1392.

Holliday returned to the emergency department at Memorial Hospital on May 21, 2012, complaining of an abscess on the right lower abdomen and dizziness for three to four days. Tr. 1103. When an attending physician reviewed Holliday's systems she denied back pain, chest pain, abdominal pain, and sensory deficits. Tr. 1104. Other

---

49. The Cluster B personality disorders are antisocial, borderline, narcissistic and histrionic.

52

than obvious obesity, the abscess on the right abdomen and elevated blood pressure, the results of a physical examination were normal, including Holliday had no back tenderness, normal muscle strength in the extremities, normal sensation and normal reflexes. Tr. 1105. Holliday was treated with an antibiotic and discharged from the hospital on May 22, 2012. Tr. 1098.

Holliday again returned to the emergency department at Memorial Hospital on July 10, 2012, complaining of back pain. Tr. 1273-1286. Other than obesity, high blood pressure, paraspinal muscle tenderness, and subjective complaints of pain with any range of motion, the results of a physical examination were essentially normal. Tr. 1275-1277. Holliday had a negative straight leg raise test, normal muscle strength in the lower extremities, normal reflexes, normal sensation, and no swelling, tenderness or edema in the lower extremities. Tr. 1277.

## Discussion

The administrative law judge at step one of the sequential evaluation process found that Holliday had not engaged in substantial gainful work activity since March 1, 2008, the original alleged disability onset date. Tr. 12.

At step two of the sequential evaluation process, the administrative law judge found that Holliday had the following severe impairments: "Mild Bilateral Carpal Tunnel Syndrome, Personality Disorder, Obesity, Degenerative Disc Disease, Bipolar Affective Disorder with Depression, Polysubstance Abuse, and Hip Bursitis." Id. The administrative law judge further found that Holliday's high blood pressure and history of polycystic ovarian syndrome were medically determinable non-severe impairments and

53

that all non-severe impairments were taken into consideration in the formulation of Holliday's residual functional capacity as set forth below. Tr. 13.

At step three of the sequential evaluation process the administrative law judge found that Holliday's impairments did not individually or in combination meet or equal a listed impairment. Tr. 13-15. In so finding the administrative law judge considered, inter alia, Listing 1.04, Disorders of the Spine, and Listing 12.04, Affective Disorders.

At step four of the sequential evaluation process the administrative law judge found that Holliday cannot perform any past relevant work but that she has the ability to perform a limited range of unskilled, sedentary work which allows her to alternate between sitting and standing at will. Tr. 15. In addition, the administrative law judge found that she can not push, pull or use foot controls with her left lower extremity; she is capable of only occasional reaching, squatting, crouching and climbing of ramps and stairs; she can not climb ladders or scaffolds; she cannot tolerate concentrated exposure to wetness or any exposure to unprotected heights; she is capable of only occasional handling and fingering bilaterally; and she is limited to only occasional interaction with supervisors, co-workers, and the public. Tr. 15. In setting the residual functional capacity, the administrative law judge found that Holliday's statements concerning the intensity, persistence and limiting effects of her impairments were not credible to the extent that they were inconsistent with her ability to engage in the work as described above. Tr. 16. The administrative law judge further relied on the psychological opinions of Dr. Rynier and Dr. Hart and the medical opinions of Dr. Furman and the physicians who treated Holliday at Memorial Hospital. Tr. 20.

54

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step five of the sequential evaluation process that Holliday could perform unskilled, sedentary work as a surveillance systems monitor, and that there were a significant number of such jobs in the state and national economies. Tr. 21-22.

Holliday argues that the administrative law judge erred at step 3 in failing to find that she met or equaled the requirements of Listings 1.04A and 12.04, and that the residual functional capacity is not supported by substantial evidence because the hypothetical questions posed to the vocational expert and the residual functional capacity set by the administrative law judge did not include Holliday's difficulties with concentration, persistence, or pace. We have thoroughly reviewed the record in this case and find no merit in Holliday's arguments. The administrative law judge did an adequate job of reviewing Holliday's vocational history and medical records in her decision. Tr. 12-26. Furthermore, the brief submitted by the Commissioner appropriately reviews the medical and vocational evidence in this case. Doc. 17, Brief of Defendant.

Holliday's first argument is premised on the contention that she met or equaled the requirements of Listing 1.04A, Disorders of the Spine, and Listing 12.04, Affective Disorders. Before we address the criteria/requirements of those listings we will mention some basic principles set forth in case law and the regulations of the Social Security Administration. If Holliday's severe impairments met or equaled a listed impairment, she would have been considered disabled per se and awarded disability benefits. However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment. Sullivan v. Zebley, 493

55

U.S. 521, 530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d). To do this a claimant must show that all of the criteria for a listing are met or equaled. Id. An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. Id. Furthermore, the Commissioner's Listings contemplate that findings satisfying the required criteria will be consistently documented over a period of time, not just on isolated examinations. 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); id. §1.00H(1)("Musculoskeletal impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").

The determination of whether a claimant meets or equals a listing is a medical one. The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing.

Initially we will note that no treating or examining physician submitted a functional assessment of Holliday to the administrative law judge which indicated that Holliday was functionally impaired from a physical or mental standpoint for the requisite

continuous 12 month period.[50]   Furthermore, no treating or examining physician

indicated that Holliday's impairments met or equaled the requirements of a listed

impairment.

     To satisfy the criteria of Listing 1.04A, a claimant must have a disorder of

the spine resulting in compromise of the nerve root with 1) evidence of nerve root

compromise characterized by neuroanatomic distribution of pain, limitation of motion of

the spine, motor loss and a positive straight leg raise (if there is lower back involvement),

2) confirmed spinal arachnoiditis, or 3) lumbar spinal stenosis with pseudoclaudication,

established by imaging and manifested by chronic pain and weakness and resulting in

the inability to ambulate effectively.[51]   20 C.F.R. pt. 404, subpt, P, app. 1, § 1.04.

     The requirements of Listing 12.04 in relevant part are as follows:

> 12.04 Affective Disorders: Characterized by a
> disturbance of mood, accompanied by a full or partial
> manic or depressive syndrome.  Mood refers to a

---

50.   To receive disability benefits, the plaintiff must demonstrate an "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not less than 12 months."
42 U.S.C. § 432(d)(1)(A).

51.   The inability to ambulate effectively is defined at 1.00B2b as follows:

> Inability to ambulate effectively means an
> extreme limitation of the ability to walk, i.e.,
> an impairment(s) that interferes very seriously
> with the individual's ability to independently
> initiate, sustain, or complete activities.
> Ineffective ambulation is defined generally as
> having insufficient lower extremity functioning
> . . . to permit independent ambulation without
> the use of handheld assistive device(s) that
> limits the functioning of both upper extremities.

57

prolonged emotion that colors the whole psychic life;
it generally involves either depression or elation.
   The required level of severity for these disorders is
met when the requirements in both A and B are satisfied
. . .

A. Medically documented persistence, either continuous
or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four
of the following:

a. Anhedonia or pervasive loss of interest in almost
all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy;
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
I. Hallucinations, delusions or paranoid thinking;

or

2. Manic syndrome characterized by at least three of
the following:
a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractability; or
g. Involvement in activities that have a high
probability of painful consequences which are not
recognized; or
h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods
manifested by the full symptomatic picture of both
manic and depressive syndromes (currently characterized
by either or both syndromes);

58

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social
functioning; or
3. Marked difficulties in maintaining concentration,
persistence or pace; or
4. Repeated episodes of decompensation, each of
extended duration[.]

20 C.F.R., pt. 404, subpt. P, app. 1, § 12.04.

Holliday has proffered no medical opinion, nor has she marshaled the evidence in the record, to support her contention that her conditions met or equaled the requirements of Listing 1.04A or Listing 12.04. The record is devoid of a positive straight-leg raising tests in both the sitting and supine position. Although there were some positive straight leg raising tests, there was no consistency because on multiple occasions medical personnel reported negative straight leg raising tests or mild pain with such testing. Tr. 470, 603-604, 610, 636, 712, 723, 1008, 1050, 1131 and 1277. Furthermore, Holliday has failed to establish she has an inability to ambulate effective as defined in the regulations.

With respect to Listing 12.04, Holliday had to establish, inter alia, that she met the criteria of subsection A and that under subsection B she had either two "marked" limitations in the categories of activities of daily living; maintaining social functioning; and concentration, persistence or pace; or one "marked" limitation coupled with repeated episodes of decompensation, each of an extended duration. See 20 C.F.R., Pt. 4040, Subpt. P, App. 1, § 12.04. The Commissioner does not argue that Decker failed to establish the criteria of subsection A. Instead, the Commissioner contends that Holliday failed to meet the criteria of subsection B. The administrative law judge found that

59

Holliday had no restrictions with respect to activities of daily living; moderate difficulties with social functioning; mild difficulties with concentration, persistence and pace; and no episodes of decompensation of an extended duration. Tr. 14. The opinions of the state agency psychologists as well as treating physicians adequately support the administrative law judge's determination regarding the subsection B criteria. Dr. Schnepp on April 5, 2011, opined that Holliday had mild limitations with respect to activities of daily living, moderate limitations with respect to social functioning and moderate difficulties with respect to concentration, persistence and pace, and no episodes of decompensation of an extended duration. Tr. 156. On December 29, 2011, Dr. Sicuranza indicated that Holliday was "able to ambulate and perform activities of daily living." Tr. 1071. Dr. Furman on January 10, 2012, also indicated that Holliday could "ambulate and perform activities of daily living." Tr. 1068. On March 24, 2012, Dr. Hart found that Holliday's "concentration was reasonably good" and that "concentration should not be a major impediment to hold down a job." Tr. 877. Although Dr. Schnepp found that Holliday had moderate limitations in her ability to maintain attention and concentration, she still had the ability to retain and follow simple job instructions and carry them out; she could perform one and two step tasks; her basic memory processes were intact for both recent and remote events; she could perform, simple, routine, and repetitive work in a stable environment; she could make simple decisions; she could maintain concentration and attention for reasonably extended periods of time when performing routine and repetitive work; and she could function in production-oriented jobs requiring little independent decision-making. The requirements of the position - surveillance systems monitor - identified by the vocational expert and accepted by the

administrative law judge fell within those parameters.[52] Notably, no physician or psychologist indicated that Holliday had marked mental limitations which would satisfy the subsection B criteria.

The administrative law judge gave an adequate explanation for finding that Holliday did not meet or equal the criteria of a listed impairment. The court cannot conclude from the bare medical records that Holliday met the requirements of Listings 1.04A and 12.04. The Court finds that the administrative law judge properly considered the medical evidence relating to whether or not Holliday met the criteria of a listed impairment.

Holliday contends that the administrative law judge in phrasing a hypothetical question for the vocational expert and in setting the residual functional capacity did not sufficiently account for Holliday's moderate limitation in concentration, persistence and pace. A residual functional capacity merely for unskilled or simple work may not account for moderate limitations in concentration, persistence or pace if those factors are not specifically delved into with the vocational expert. However, in the present case, there was medical evidence which indicated that Holliday had sufficient concentration, persistence and pace to engage in the unskilled, sedentary work identified by the vocational expert and the administrative law judge in her decision, i.e., the opinions of Dr. Hart, Dr. Ruch and Dr. Schnepp.

---

52. According to the Dictionary of Occupational Titles the positions is unskilled, sedentary work with a Special Vocational Preparation (SVP) of 2. The SVP is defined as the amount of lapsed time required by a typical worker to learn the job. The time for an SVP 2 position is "[a]nything beyond a short demonstration up to including 1 month." Dictionary of Occupational Titles (4th Ed., Rev. 1991) – Appendix C, http://www. oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (Last accessed June 8, 2015).

The administrative law judge relied on the opinions of the state agency psychologists and the other treating physicians. The administrative law judge's reliance on those opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

To the extent that Holliday argues that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Holliday's claims regarding her physical or mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Holliday testify, the administrative law judge is the one best suited to assess her credibility.

We are satisfied that the administrative law judge based on the evidence before her appropriately took into account all of Holliday's mental and physical limitations in the residual functional capacity assessment.

62

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

Robert D. Mariani
United States District Judge

Date: June ⟩ 2015

63